UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| M.A. EDWARDS,<br>      Plaintiff,<br><br>v.<br><br>COMMISSIONER ARNONE et al.,<br>      Defendants. | No. 3:11-cv-01537 (SRU) |

## RULING ON DEFENDANT'S RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW AND MOTION FOR NEW TRIAL AND REMITTITUR

**I.**    **Introduction**

M. A. Edwards ("Edwards") filed this Section 1983 civil action against former Connecticut Department of Corrections ("DOC") Commissioner Leo Arnone and various prison officials ("Defendants") at Northern Correctional Institution ("Northern"), asserting that the Defendants violated the Eighth Amendment's prohibition on cruel and unusual punishment. Specifically, Edwards alleged that the Defendants denied him any meaningful opportunity to exercise by requiring him to recreate in full restraints while he was in Phase 1 of the Administrative Segregation ("AS") Program at Northern.

The case proceeded to a jury trial against Warden Quiros ("Quiros") and Deputy Warden Lauren Powers ("Powers").[1] On December 19, 2018, after a three-day trial, the jury ruled in Edwards' favor, finding that Quiros violated Edwards' constitutional right to be free from cruel

---

[1] Quiros was the Warden at Northern from July 1, 2009 to April 1, 201l, and Powers was the Deputy Warden at Northern from July 2009 to May 2011. Trial Tr. at 39, 171.

and unusual punishment.² The jury awarded Edwards $500,000 in compensatory damages and $250,000 in punitive damages.

Quiros now challenges that verdict and award, moving for judgment as a matter of law under Rule 50(b), or, in the alternative, for a new trial under Rule 59 of the Federal Rules of Civil Procedure. *See* Mem. in Supp. Mot. for Judgment/Mot. for New Trial ("Def's Mot.") (Doc. No. 188-1). Quiros asserts five grounds in support of his motion: (1) Edwards failed to present evidence that Quiros violated his Eighth Amendment rights; (2) Quiros is protected by qualified immunity; (3) there was no evidence to support an award of punitive damages; (4) the jury instructions improperly shifted the burden of proof to the Defendants to prove that there were no other alternatives to recreating Edwards in full restraints; and (5) remittitur of compensatory and punitive damages is appropriate. For the reasons set forth below, Quiros' motion for judgment as a matter of law is **granted**.

## II. Background

Edwards has been incarcerated in Connecticut for the past twenty-two years after being convicted of murder. Trial Tr. at 375. He was transferred to Northern, a level 5 maximum security prison, on September 21, 2010 after assaulting a correctional officer at Corrigan-Radgowski Correctional Institution. Trial Tr. at 37, 82. When Edwards arrived at Northern, Quiros was the Warden and the facility's highest ranking official. Trial Tr. at 39–40, 51.

Northern housed inmates who were involved in the DOC's AS program. *See* Trial Tr. at 231–32. The purpose of the AS program was to reacclimate inmates who were charged with violent infractions in other DOC facilities back to general population. Trial Tr. at 72–74. The

---

² The jury found that Powers was not liable for her conduct. Prior to the presentation of evidence, Edwards agreed to dismiss his claims against Commissioner Arnone and District Administrator Lajoie, leaving Quiros as the only remaining Defendant in the case.

2

AS program at Northern was conducted in three phases. Trial Tr. at 72–73. An inmate would begin in Phase I, the most restrictive phase, where his behavior would be closely monitored by DOC staff. Trial Tr. at 73, 202. Inmates in Phase I were in "full restraints" when outside of their cells, which Qurios described as "handcuffs behind the back, leg irons applied to the ankles, and a tether chain applied to the handcuff and the leg iron." Trial Tr. 42, 203. Quiros testified that Phase I is a "cool-down period so that the offender can come to term[s] that he's been assigned, classified to Northern; that in order to go back to general population, he's going to have to participate in the programs." *Id*. Inmates are kept in Phase I for approximately six months, until a progression hearing to determine if they can move to Phase II. *Id.*

Phase II is somewhat less restrictive than Phase I. Trial Tr. at 203. During Phase II, inmates are in handcuffs for the first thirty days and are assigned to small groups of four to eight inmates for programming and recreation. *Id*. After Phase II, an inmate would progress to Phase III, the least restrictive phase. *Id*. In Phase III, inmates would eat meals in the day room and have more opportunities for out-of-cell recreation and programming. Trial Tr. at 203–04. Upon successful completion of Phase III, an inmate would be transferred out of Northern back to general population. Trial Tr. at 76.

To accommodate the AS program, Northern was divided into three sections to house inmates from each phase. Trial Tr. at 207. Inmates in Phase I were housed in Unit One ("the 1s"), inmates in Phase II were housed in Unit 2 ("the 2s"), and inmates in Phase 3 were housed in Unit 3 ("the 3s"). *See* Trial Tr. at 207–10. Quiros testified that there were many differences between Units 1 and 3. *Id*. Unit 3 was typically quieter than Unit 1 and did not have as many doors between cells. Trial Tr. at 207. In addition, he testified that Unit 3 was much more open. *Id*. "The day room is open. The recreation area is open versus having the sections in the 1s. The

overall unit is quieter. It's more – mirrors more of a general population unit." *Id.* Unlike the 3s, the 1s did not have open recreation. *Id.* Instead, inmates in Phase I were required to recreate in "secure cages" within Unit One where their restraints would be removed through trap doors after entering each cage. Trial Tr. at 258.

From September 2010 to March 2011, Northern was described as an "extremely volatile" and "high stress" environment, due to an increase in inmate assaults on staff. Trial Tr. at 320. While Edwards was at Northern, the facility was at maximum capacity. *See* Trial Tr. at 93. Often there would be no available beds to house all Phase I inmates in Unit One. *Id.* Therefore, Northern implemented an "overflow" policy, where Phase One inmates on full restraint status would temporarily be held in Unit Three. Trial Tr. at 93. During the period when the overflow policy was in effect, Phase One inmates were required to recreate in full restraints, due to the lack of secure cages in Unit Three. Trial Tr. at 161, 258. Quiros testified that as the Warden at Northern, he had discretion at any time to modify the restraint status of any inmate. Trial Tr. at 50–51.

Edwards arrived at Northern on September 21, 2010. *See* Trial Tr. at 37. He transferred to the Phase I overflow unit November 3, 2010 until March 24, 2010. *Id.* As a result, from September 21, 2010 to March 24, 2011, Edwards was kept in full restraints during recreation. Trial Tr. at 43. On March 5, 2011, Edwards sent an inmate request form concerning his restraint status to Quiros. *See* Pl's Tr. Ex. 23. Quiros responded on March 8, 2011, denying his request. *Id.* On March 10, 2011, Edwards filed a formal grievance addressed to Quiros regarding his full restraint status during recreation. Pl's Tr. Ex. 26. Edwards' grievance stated:

> I arrived at Northern on 9/21/2010. I am being forced to go to my one hour recreation fully restrained. I'm [hand] cuffed behind [my] back, my handcuffs tethered to my foot shackles. I cannot exercise like this. I would like facility to put traps on outside

4

recreation -- rec doors so that I can be uncuffed when I go to the rec, just like I am cuffed in cell to go to rec. I have been going to rec like this for six months.

Trial Tr. at 110; Pl's Tr. Ex. 26.

On March 24, 2011, two weeks after filing his grievance, Edwards was transferred from Phase I to Phase II. Trial Tr. at 116. As a result, he was no longer on full restraint status during recreation in Unit Three. *See* Trial Tr. at 42, 257. Quiros denied Edwards' grievance on April 11, 2011, stating "[t]he restraint policy that you referenced has been reviewed and approved and will remain in place." Pl's Tr. Ex. 26.

On October 6, 2011, Edwards filed a *pro se* complaint in this court, asserting an Eighth Amendment claim for denial of his ability to recreate for six months because he was required to attend recreation in full restraints. *See generally* Compl. (Doc. No. 1). On January 9, 2014, United States District Judge Alfred V. Covello granted the Defendants' motion for summary judgment on qualified immunity grounds. *See* Doc. No. 82. Edwards appealed that ruling, (doc. no. 83) and the Second Circuit ruled in his favor, holding that "[u]nder existing clearly established case law, a reasonable juror may conclude that reasonable officers would agree that fully restraining inmates during out-of-cell exercise without an adequate safety justification is unconstitutional." Doc. No. 87 at 6. The Defendants filed a supplemental motion for summary judgment, which Judge Covello denied on August 9, 2016. *See* Doc. No. 116. On December 21, 2016, Judge Covello granted Edwards' renewed motion to appoint counsel. *See* Doc. No. 119. On October 20, 2017, the case was transferred to my docket. *See* Doc. No. 128. The case proceeded to trial on December 17, 2018. *See* Doc. No. 174.

At the close of Edwards' case, the remaining Defendants orally moved for judgment as a matter of law. *See* Doc. No. 176; Trial Tr. at 431–32. Quiros renewed his motion at the conclusion of evidence. *See* Doc. No. 179; Trial Tr. at 554. I took both motions under

5

advisement and directed Quiros' counsel to file an accompanying memorandum of law at a later date. *See* Trial Tr. at 554. I denied the Defendants' oral motions on September 25, 2019 (doc. no. 208), in light of Quiro's instant motion filed on January 16, 2019 (doc. no. 188).

## III.   Standard of Review

Rule 50(b) of the Federal Rules of Civil Procedure allows for the entry of judgment as a matter of law if a jury returns a verdict for which there is no legally sufficient evidentiary basis. *See* Fed. R. Civ. P. 50. The standard under Rule 50 is the same as that for summary judgment: A court may not grant a Rule 50 motion unless "the evidence is such that, without weighing the credibility of the witnesses or otherwise considering the weight of the evidence, there can be but one conclusion as to the verdict that reasonable [persons] could have reached." *This Is Me, Inc. v. Taylor*, 157 F.3d 139, 142 (2d Cir. 1998) (citation and internal quotation marks omitted). Thus, in deciding such a motion, "the court must give deference to all credibility determinations and reasonable inferences of the jury . . . and it may not itself weigh the credibility of the witnesses or consider the weight of the evidence." *Galdieri-Ambrosini v. Nat'l Realty & Dev. Corp.*, 136 F.3d 276, 289 (2d Cir. 1998) (citations omitted). In short, the court cannot "substitute its judgment for that of the jury." *LeBlanc-Sternberg v. Fletcher*, 67 F.3d 412, 429 (2d Cir. 1995) (citations omitted). Rather, judgment as a matter of law may only be granted if:

> (1) there is such a complete absence of evidence supporting the verdict that the jury's findings could only have been the result of sheer surmise and conjecture, or
>
> (2) there is such an overwhelming amount of evidence in favor of the movant that reasonable and fair minded persons could not arrive at a verdict against it.

*Galdieri-Ambrosini*, 136 F.3d at 289 (quoting *Cruz v. Local Union No. 3 of the Int'l Bhd. of Elec. Workers*, 34 F.3d 1148, 1154 (2d Cir. 1994)) (internal quotation marks omitted); *see also Luciano v. Olsten Corp.*, 110 F.3d 210, 214 (2d Cir. 1997).

In contrast, the decision whether to grant a new trial following a jury trial under Rule 59 is "'committed to the sound discretion of the trial judge.'" *Stoma v. Miller Marine Servs., Inc.*, 271 F. Supp. 2d 429, 431 (E.D.N.Y. 2003) (quoting *Metromedia Co. v. Fugazy*, 983 F.2d 350, 363 (2d Cir. 1992)). A new trial "'should be granted when, in the opinion of the district court, the jury reached a seriously erroneous result or . . . the verdict is a miscarriage of justice.'" *DLC Mgmt. Corp. v. Town of Hyde Park*, 163 F.3d 124, 133 (2d Cir. 1998) (quoting *Song v. Ives Labs., Inc.*, 957 F.2d 1041, 1047 (2d Cir. 1992)). "A new trial may be granted, therefore, when the jury's verdict is against the weight of the evidence." *Id.*

## IV. Discussion

### A. There is a Lack of Evidence Supporting the Jury's Finding that Quiros Violated Edwards' Eighth Amendment Rights

In his motion, Quiros contends that "there is a complete absence of evidence upon which the jury could have concluded that Warden Quiros violated [Edwards'] Eighth Amendment right to be free from cruel and unusual punishment." Def's Mot. at 7. Specifically, Quiros argues that Edwards failed to prove that Quiros was personally involved in a restriction on Edwards' right to exercise that would constitute an Eighth Amendment violation. *Id.* at 8. "Quiros' personal involvement in any restriction on [Edwards'] right to exercise, if any, is limited to a period of nineteen days." *Id.* That limited time period, Quiros contends, is not enough to amount to cruel and unusual punishment under the Eighth Amendment. *See id*. at 9–13.

In response, Edwards asserts that the record fully supports the jury's finding. *See* Mem. in Opp. (Pl's Opp.) (Doc. No. 199) at 13. "[Quiros] had authority to allow [Edwards] to recreate

7

in the Three's without restraints . . . . [S]taff did not regard [Edwards] as a serious threat to inmate and staff safety. [Therefore] [Quiros'] failure to allow [Edwards] to exercise without restraints represented an objectively unreasonable deprivation of [Edwards'] Eighth Amendment rights." *Id.* at 18. (internal citation omitted). In addition, Edwards argues that "at no point did [Quiros] take any action to ensure that [Edwards] receive a meaningful opportunity to exercise." *Id.* at 25.

The Eighth Amendment prohibits the infliction of "cruel and unusual punishments" on those convicted of crimes. U.S. Const. amend. VIII. To prevail on his Eighth Amendment claim, Edwards must prove "both an objective element—that the prison officials' transgression was 'sufficiently serious'—and a subjective element—that the official acted, or omitted to act, with a 'sufficiently culpable state of mind,' *i.e.*, with 'deliberate indifference to inmate health or safety.'" *Phelps v. Kapnolas*, 308 F.3d 180, 185 (2d Cir. 2002) (quoting *Farmer v. Brennan*, 511 U.S. 825, 834 (1994)). A condition is objectively serious if it deprives Edwards of basic human needs—*e.g.*, food, clothing, shelter, medical care, and reasonable safety." *Id.* (quoting *Helling v. McKinney*, 509 U.S. 25, 32 (1993)) (internal quotation marks omitted). "Ultimately, to establish the objective element of an Eighth Amendment claim, a prisoner must prove that the conditions of his confinement violate contemporary standards of decency." *Id.*

To meet the subjective component, Edwards must show that Quiros knew "of and disregard[ed] an excessive risk to inmate health or safety," that is, that he was "aware of facts from which the inference could be drawn that a substantial risk of serious harm exist[ed], and . . . dr[e]w the inference." *Id.* at 185–86 (internal citation omitted). The requisite knowledge of risk may be inferred "from the fact that the risk of harm is obvious." *Hope v. Pelzer*, 536 U.S. 730, 738 (2002) (citing *Farmer*, 511 U.S. at 825); *see also Walker v. Schult*, 717 F.3d 119, 125 (2d

Cir. 2013) (quoting *Brook v. Wright*, 315 F.3d 158, 164 (2d Cir. 2003) ("Evidence that a risk was 'obvious or otherwise must have been known to a defendant' may be sufficient for a fact finder to conclude that the defendant was actually aware of the risk."). The Supreme Court has identified exercise as a human need protected by the Eighth Amendment. *See Wilson v. Seiter,* 501 U.S. 294, 304 (1991). The Second Circuit has held that prisoners possess an Eighth Amendment right to the opportunity to exercise. *See Williams v. Greifinger,* 97 F.3d 699, 704 (2d Cir. 1996).

1. *Quiros' Personal Involvement is Limited to March 8, 2011 to March 24, 2011*

Although there can be little doubt that requiring an inmate to exercise in full restraints for a period of six months could give rise to a valid Eighth Amendment claim, the significant question raised by the motion for judgment as a matter of law is whether Quiros can be held liable for that violation. Quiros argues that the evidence presented at trial fails to establish that he was personally involved in Edwards' full six-month restriction on recreation. *See* Def's Mot. at 8. After reviewing the evidence in the record in a light most favorable to Edwards, I agree with Quiros.

Although Quiros was the Warden throughout Edwards' stay in Phase I, Quiros and Edwards both testified that the first time Edwards communicated with Quiros regarding the issue of being forced to recreate in full restraint status was his March 5 inmate request form. Trial Tr. 105–06, 406. Prior to Edwards' inmate request form, however, there was no evidence presented that Quiros was aware that Edwards had been recreating in full restraints for nearly six months.

It is undisputed that "overflow" Phase I inmates like Edwards, who recreated in Unit Three, were placed in full restraints during their out-of-cell activities. *See, e.g.*, Trial Tr. at 93.

The evidence showed that Quiros was involved in implementing the overflow policy.[3] Trial Tr. at 50, 94. The evidence also showed that Quiros intended the overflow policy to be temporary. Trial Tr. at 94. "[T]he overflow is a temporary basis, which means that the offender will be in and out for -- on a rotating basis, anywhere from two -- *a week to two week[s]*. Once the bed became available, they would end up in 1 East and 1 West and recreate without restraints." *Id.* (emphasis added). Before Edwards notified Quiros in early March 2011 that he had been recreating in full restraints for six months, there was no evidence that Quiros was aware that Edwards had been deprived of meaningful recreation for that long.

There is also no evidence that Quiros ever received a request from Edwards to move from Unit Three to Unit One, before his March 5, 2011 inmate request form. As noted during trial, the daily operation of the housing units did not reach the warden level. *See* Trial Tr. at 95. Those requests were typically referred to Captain Marinelli. *See, e.g.,* Trial Tr. at 184. Regarding Edwards' specific deprivation, the evidence showed that Quiros' personal involvement began when he received Edwards' March 5, 2011 inmate request form. Trial Tr. at 105–06. "I'm aware he sent me an inmate request. I believe March 8." *Id.* On March 8, 2011, Quiros received Edwards' March 5 inmate request form. *See* Pl's Tr. Ex. 26. Quiros testified that the first time he reviewed the recreation restraint policy was when responding to Edwards' March 10 grievance on April 11, 2011. Trial Tr. at 114.

> Q: So the [restraint] policy wasn't reviewed until April 11, 2011?
>
> A: [Edwards] brought it -- brought it to my attention, and I reviewed it -- whatever details he had, allegations he made, I reviewed that policy . . . .
>
> Q: So you reviewed that policy, the full restraint policy while in rec policy on March 10 of 2011?

---

[3] In fact, Quiros testified that as Warden "I got the discretion at any time to -- to modify the restraint status" of any inmate. Trial Tr. at 51.

>A: Yes . . . .

>Q: And you didn't review it before that time, did you?

>A: There was no complaint . . . .

>Q: Okay. I asked you, you didn't review that policy before March 10 of 2011, did you?

>A: No.

Trial Tr. at 114–15.

Consistent with Quiros' testimony, Edwards testified that the first time he wrote to Quiros about his restraint status in Unit Three was in early March.

>Q: Okay. Now, would you agree that the first time you raised the issue of your recreating in restraints to Warden Quiros was your grievance that you wrote to him, the exhibit that I showed you previously?

>A: Correct.

>Q: So March of 2011 was the first time you made the warden aware that that's how you were having to rec, in restraints?

>A: Yes.

Trial Tr. at 421. There was no testimony that Edwards made Quiros aware of his restrain status prior to March 5, 2011.

To the extent that Edwards argues that Quiros was personally involved with Edwards' deprivation because the overflow restraint policy was in place during his tenure as Warden, that argument is unavailing. *See* Pl's Opp. at 25. Although Quiros had the authority to change the restraint policy at any time, he was only aware of Edwards' six-month deprivation for a total of approximately sixteen days. As noted by the parties, however, supervisory position alone is not enough to satisfy the personal involvement requirement of Section 1983. *See* Def's Mot. at 8; Pl's Opp. at 26. "Absent vicarious liability, each Government official, his or her title

11

notwithstanding, is only liable for his or her own misconduct." *Ashcroft v. Iqbal*, 556 U.S. 662, 677, (2009).

Furthermore, Edwards contends that Quiros is liable under the five factors set forth in *Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir. 1995). *See* Pl's Opp. at 26. In that case, the Second Circuit stated that the personal involvement requirement may be established by evidence that:

> (1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring.

*Colon* at 58 F.3d at 873 (quoting *Williams v. Smith*, 781 F.2d 319, 323–24 (2d Cir.1986)). Quiros' failure to amend the restraint policy before receiving Edwards' March 8 complaint does not satisfy the five factors. There was no evidence presented that Quiros was "grossly negligent in supervising subordinates," nor was there any evidence that Quiros was "informed of the violation through a report or appeal" prior to March 5, 2011.

During trial, Edwards failed to prove that Quiros was aware that he was on restraint status during recreation for his full six-month stay in Phase I. The evidence presented shows that Quiros was personally involved with Edwards' deprivation only from March 8, 2011(when he first received Edwards request form) until Edwards' release from Phase II on March 24, 2011.

2. *A Sixteen-Day Restriction on Recreation Does not Amount to an Eighth Amendment Violation*

Here, the evidence established that Quiros was personally involved with Edwards' deprivation from March 8, 2011 to March 24, 2011. A sixteen-day deprivation, however, does not constitute a violation under the Eighth Amendment.

Although a deprivation of all opportunities to exercise over a substantial period of time may state a violation of the Eighth Amendment, courts in this Circuit have consistently held that depriving an inmate of exercise for a relatively brief period of time does not violate the Eighth Amendment. *See, e.g., Branham v. Meachum*, 77 F.3d 626, 630–31 (2d Cir. 1996) (holding that keeping plaintiff on full restraint status without outdoor recreation for twenty-two days does not state an Eighth Amendment claim); *Torrez v. Semple*, 2018 WL 2303018, at *6 (D. Conn. May 21, 2018) ("Because Torrez has alleged that he was denied recreation for a period of only ten days, he has not stated a plausible Eighth Amendment claim. The claim regarding recreation is dismissed."); *Riddick v. Arnone*, 2012 WL 2716355, at *5 (D. Conn. July 9, 2012) (concluding that denial of exercise for ten days is *de minimis* and does not rise to the level of an Eighth Amendment violation); *Davidson v. Coughlin*, 968 F. Supp. 121, 131 (S.D.N.Y. 1997) (holding that deprivation of exercise for fourteen days did not violate the Eighth Amendment).

As discussed above, the evidence presented in this case only established that Quiros contributed to Edwards' deprivation, for at most, sixteen days. Although contemporary standards of decency are quickly changing (as evidenced by the jury's verdict), the case law above establishes that, as things stand now, a sixteen-day deprivation is insufficient to substantiate an Eighth Amendment claim.

Therefore, I conclude that Quiros is entitled to judgment as a matter of law.[4]

**V.      Conclusion**

For the reason stated above, Quiros' motion for judgment as a matter of law (doc. no. 188) is **granted** and his requests for a new trial and remittitur are **denied** as moot.

So ordered.

Dated at Bridgeport, Connecticut, this 30th day of September 2019.

/s/ STEFAN R. UNDERHILL
Stefan R. Underhill
United States District Judge

---

[4] Because I conclude that there is a lack of evidence to support the jury's finding that Quiros violated Edwards' Eighth Amendment rights, I do not reach Quiros' additional arguments in support of his motion.